# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 8, 2014

## STATE OF TENNESSEE v. DWIGHT GOSSETT

**Appeal from the Criminal Court for Shelby County**
**No. 1201774     Lee V. Coffee, Judge**

**No. W2013-01120-CCA-R3-CD  - Filed November 21, 2014**

The defendant, Dwight Gossett, was convicted of two counts of aggravated sexual battery, Class B felonies, and sentenced to two consecutive twelve-year sentences for an effective sentence of twenty-four years.  On appeal, he argues that: (1) the trial court erred in admitting the forensic interviews of the victims as substantive evidence pursuant to Tennessee Code Annotated section 24-7-123 (2010) because the statute is unconstitutional; (2) the evidence is insufficient to sustain his convictions; (3) the trial court erred in admitting testimony of the defendant's prior bad act; (4) the trial court committed plain error when it failed to require the State to make an election of offenses and when it failed to instruct the jury as to the election of offenses; (5) the State made a prejudicially improper closing argument; (6) the trial court imposed an excessive sentence inconsistent with the principles of the Sentencing Act; and (7) the cumulative effect of these errors violated the defendant's due process rights. After thoroughly reviewing the record, the briefs of the parties, and the applicable law, we conclude that the trial court erroneously admitted evidence of the defendant's prior bad act and that the prosecutor delivered an improper closing argument.  Accordingly, we reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed;
Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined.  JERRY L. SMITH, J., not participating.

Stephen Bush, District Public Defender and Phyllis Aluko, Assistant District Public Defender, Memphis, Tennessee, for the appellant, Dwight Gossett.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Carrie Shelton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

This case arose out of the defendant's inappropriate sexual contact with the minor victims. Between October 15, 2008, and September 2, 2010, the defendant inappropriately touched his step-granddaughters, A.R. and A.C.R.,[1] several times. The contact occurred at the defendant's residence, a place where the victims frequently spent time. The victims' mother often took the victims to the defendant's residence, and the victims' mother and grandmother had no issue placing the victims in the care of the defendant. At the time of the trial, A.R. was ten years old and A.C.R. was eight years old.

The first incident involved A.R. when she was eight years old and occurred on the patio of the defendant's residence. A.R. had been playing "dress-up" with her younger sister when she went to the backyard to check on the "kiddie pool" that the defendant and the victims' grandmother had recently purchased. The defendant was working on the pool, which A.R.'s mother testified was acquired in the summer of 2010, in the backyard. A.R. was wearing a "loose tank top" that belonged to her grandmother and a "dress-up tutu[.]" When A.R. was on the back patio, the defendant approached her, pulled down her tank top, and kissed one of her breasts twice. The defendant asked A.R. if she liked it and when she told him, "No," the defendant told her "Shh[.]" A.R. took this to mean that she should not mention the incident to anyone. A.R. did not tell her mother about the incident because she thought she would get in trouble, but she did tell her younger sister, A.C.R., about the defendant's actions.

Sometime after the incident on the patio, A.R. was at the defendant's residence washing her grandmother's car with her younger sister and several friends from the neighborhood. A.R. went inside of the house alone to get popsicles, and she ran into the defendant. The defendant looked down, pointed at his penis, and asked A.R. if she wanted to touch it. A.R. said, "No," and the defendant attempted to pull A.R.'s hand toward his penis. He managed to pull her hand to within inches of his penis, but A.R. did not touch it. Frightened, she ran back outside without the popsicles.

---

[1] In order to protect their identity, we will refer to the victims and other minors by their initials.

A third incident occurred when A.R. was playing "house" with her younger sisters in the living room of the defendant's residence. The defendant entered the room and asked for one of the girls to get him a drink, and A.R. agreed. A.R. brought the drink to the defendant in his bedroom, where the defendant was alone and seated in his desk chair. The defendant then rose and pulled his pants and underwear down to his "mid-thigh," and A.R. saw the defendant's penis. After both of these incidents, the defendant told A.R., "Shh," and he instructed her not to tell anyone about the incident. After the third incident, A.R. told her grandmother that the defendant was "sexy" in an attempt to convey to her grandmother that the defendant was doing sex-related things to her.

The incident with A.C.R. also occurred in the defendant's bedroom. A.C.R. brought the defendant lunch in his room, and the defendant was seated at his desk using his computer. Once A.C.R. entered the room, the defendant stood up, unbuckled his pants, grabbed A.C.R.'s hand and placed it inside of his pants. A.C.R. attempted to move her hand to the side, and she touched the defendant's skin. The defendant told her, "Shh," and A.C.R. then pulled her hand away and exited the room. A.C.R. testified that, prior to this incident, she had never spoken to the defendant about having seen or touched someone else's penis.

In early September 2010, A.R. and A.C.R. went to dinner with their mother, younger siblings, aunt, and two cousins. A.R. and A.C.R. were at a separate table with their cousins, and A.C.R. told her cousin C.J. that she had a secret that she would not tell anyone but him. C.J. recalled that A.C.R. was very calm, which was unusual because she was typically energetic. C.J. testified that A.C.R. told him that her grandfather made her touch his private parts, although A.C.R. testified that A.R. told C.J. about the abuse. C.J. looked alarmed when he heard about the touching, prompting the victims' aunt to ask what the children were talking about. The victims then told their mother for the first time about the incidents of abuse. The victims' mother contacted the police and the victims' grandmother and made an appointment for the victims at the Child Advocacy Center. The victims' grandmother called police after speaking with her daughter, and the defendant quickly moved out of the home after the allegations were made.

At the time the allegations were made against the defendant, Lieutenant Carl Ray was a sergeant and investigator with the Memphis Police Department's Child Abuse Sex Crimes division. He was assigned to the victims' case and scheduled the victims for a forensic interview. Lieutenant Ray did not conduct these interviews, but he observed the interviews from a separate room. Lieutenant Ray personally observed A.C.R.'s interview and later went back and reviewed the tape of A.R.'s interview. As a result of the victims' interviews, Lieutenant Ray contacted the defendant and asked him to come in for an interview.

The defendant came on his own to the interview and was not shackled or handcuffed.

3

Before speaking with the defendant, Lieutenant Ray advised the defendant of his *Miranda* rights. The defendant signed a rights waiver form indicating that he understood his rights and was voluntarily waiving them. The defendant told Lieutenant Ray that he was being charged with "[s]exual abuse or something." When asked to describe what occurred to result in these allegations, the defendant recalled an incident when A.C.R. entered his bedroom while he was changing his shirt and would not leave. A.C.R. began "bragging about what she had seen on other males, including full exposure of the genitals and touching." The defendant said "mean like this[?]" and touched A.C.R.'s hand to his belt buckle. A.C.R. had a "shock[ed] look on her face," seeming surprised that the defendant "called her out on her bragging." He told Lieutenant Ray that he "never had a problem" getting A.C.R. out of his room after the incident. He recalled that his wife and A.R. were in the house during this incident.

The defendant stated that he was alone with A.R. when she was younger and recalled being outside with A.R. by the pool. When asked if he ever touched or kissed A.R.'s breast, the defendant responded, "No, I don't remember. I can't thin[k] of any thing that could have happened to make her think that." He denied ever pulling down his boxers and telling A.R. to touch his penis while A.C.R. was in the room, and he stated that he did not wear boxers. He stated that he may have rubbed the victims' breasts when "picking them up or something" because the victims were small and the defendant had large hands that covered "a lot of area." He admitted that a former girlfriend made charges with the Department of Human Services (DHS) alleging that he abused one of her daughters. He stated that he never heard from DHS and that the allegation was twenty-five or thirty years old. When asked if he ever touched or fondled the victims in an inappropriate manner, he responded, "I would say no."

At trial, the defendant testified he was in his room changing his shirt when A.C.R. told him, "I have seen all of that." He stated that he touched A.C.R.'s hand to his belt buckle "to see if she was telling the truth" about having seen the private parts of other men. He stated that he had asked her to leave his room while he changed his shirt and performed his "test" to get her to leave the room. He reiterated that he never touched either victim inappropriately.

L.[2] testified that she began living with her mother and the defendant, who were dating at the time, when she was fourteen years old. Whenever her mother was "out selling Avon" or taking her sister to receive allergy shots, the defendant had sexual intercourse with L. in the bedroom and the garage. This occurred over a two-year period until the Department of Social Services removed L. from the home.

---

[2] We refer to this witness by her first initial in order to protect her identity because she also was a minor at the time of her abuse.

The defendant testified that L.'s mother made the allegations against him "as an excuse to turn [L.] over to the State when [her mother] left town." He stated that he did not find out about the allegation until years later, and he testified that he did not have sexual relations with L. He recalled that L. was fourteen to seventeen years old when she began living with him.

At the conclusion of the proof, the jury found the defendant guilty on both counts. The court sentenced the defendant as a Range I, standard offender to twelve years on each count to be served consecutively, for an effective sentence of twenty-four years.

## ANALYSIS

### I. Constitutionality of T.C.A. § 24-7-123

The defendant argues that Tennessee Code Annotated section 24-7-123 is unconstitutional for numerous reasons. He also argues that the trial court abused its discretion in determining that the forensic interviewers possessed the necessary criteria to warrant the admissibility of the recorded interviews of the victims and in determining that the interviews were admissible as prior consistent statements. The statute permits the admission, either as substantive evidence or as a prior consistent statement, of a video recording of an interview of a child under the age of thirteen by a forensic interviewer where the child describes any act of sexual contact performed with or on the child by another. T.C.A. § 24-7-123(a). The interview "may be considered for its bearing on any matter to which it is relevant evidence at the trial" of the defendant. *Id.* In order to admit the video, the child must testify, under oath, that the offered recording is an accurate recording of the events contained in the recording, and the child must be available for cross-examination. *Id.* at (b)(1). The trial court must be reasonably satisfied that the interview possesses particularized guarantees of trustworthiness, and the court shall consider a variety of factors in making this determination. *Id.* at (b)(2)(A)-(K). The forensic interviewer conducting the interview must possess specific educational, employment, and training qualifications. *Id.* at (b)(3)(A)-(H). The entire interview must be recorded, the recording must be both visual and oral and recorded on film, video, or a similar audio-visual means, and every voice heard on the recording must be properly identified. *Id.* at (b)(4)-(6). The trial court must make specific findings of fact explaining its ruling regarding the admissibility of the interview. *Id.* at (d). The recording shall not become a public record in any legal proceeding, and the trial court shall order the recording to be sealed and preserved at the conclusion of the trial. *Id.* at (e).

Prior to trial, the court held an evidentiary hearing to determine the admissibility of the victims' forensic interviews. Multiple witnesses, including the victims and their forensic

5

interviewers, testified. At the conclusion of the hearing, the trial court found that the statute was constitutional and that all of the statutory requirements for admission were met. The court also determined that the forensic interviews would be admissible as prior consistent statements to rehabilitate the witnesses if their credibility was attacked on cross-examination.

In order for this court to address the merits of a constitutional challenge, there must be a genuine "case" or "controversy" present, and the defendant must have standing to bring the challenge. We will not pass on the constitutionality of a statute unless absolutely necessary for the determination of the case and of the rights of the parties to the litigation. *County of Shelby v. McWherter*, 936 S.W.2d 923, 931 (Tenn. Ct. App. 1996).

We are charged with upholding the constitutionality of a statute whenever possible. *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997). "It is well-settled in Tennessee that 'courts do not decide constitutional questions unless resolution is absolutely necessary to determining the issues of the case and adjudicating the rights of the parties.'" *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) (quoting *State v. Taylor*, 70 S.W.3d 717, 720 (Tenn. 2002)); *see Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). Therefore, we begin our analysis "with the presumption that an Act of the General Assembly is constitutional[,]" and we are required to "'indulge every presumption and resolve every doubt in favor of the statute's constitutionality.'" *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003) (quoting *Taylor*, 70 S.W.3d at 721. Issues of constitutional interpretation present questions of law, which this court reviews *de novo* with no presumption of correctness regarding the legal conclusions of the trial court. *State v. Robinson*, 29 S.W.3d 476, 480 (Tenn. 2000).

Here, the trial court admitted the forensic interviews of the victims for two reasons. First, the trial court admitted the evidence pursuant to T.C.A. § 24-7-123, and second, the trial court ruled that the evidence was admissible as a prior consistent statement for the purpose of rehabilitating a witness. Recently, a panel of this court addressed the constitutionality of § 24-7-123 and noted that if the interview was admissible at trial pursuant to another rule of evidence, it would be unnecessary to determine the constitutionality of section 24-7-123 as a method of evidentiary admission. *State v. Barry D. McCoy*, No. M2011-02121-CCA-R3-CD, 2012 WL 1941775, at *4 (Tenn. Crim. App. May 30, 2012), *perm. app. denied* (Tenn. Sept. 19, 2012). This court has repeatedly held that a prior consistent statement is admissible as an exception to the hearsay rule to rehabilitate a witness after an impeaching attack on the witness's testimony. *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). Therefore, we must first determine whether the trial court properly admitted the interviews as prior consistent statements. If the interviews were properly admitted as an exception to the rule against hearsay, we need not address the defendant's constitutional claims because resolution of the constitutional issue is not necessary to determine the issues of the case. *See Barry D. McCoy*, 2012 WL 1941775, at *4.

6

The trial court possesses the sound discretion to determine the admissibility of evidence at trial and that determination will be upheld unless there is a showing that the trial court abused its discretion. *See State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). The general rule is that prior consistent statements are inadmissible to bolster a witness's credibility in the absence of an impeaching attack on that testimony. *Meeks*, 867 S.W.2d at 374 (citing *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). However, several exceptions to this rule exist, and "prior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied." *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). The impeaching attack on the witness's credibility need not be successful in order to admit the prior consistent statement, and wide latitude is given when determining whether the witness's credibility has been sufficiently assailed or attacked. *State v. Albert R. Neese*, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App. Dec. 15, 2006), *perm. app. denied* (Tenn. Apr. 23, 2007). The prior consistent statement is not hearsay because it was offered to rehabilitate the witness and not to prove the truth of the matter asserted. Tenn. R. Evid. 801(c).

On cross-examination, defense counsel asked A.R. why she did not immediately tell her mother or grandmother about the abuse, with the inference being that she did not disclose the incident because the touching did not occur. Defense counsel elicited an admission from both victims that they continued to go to the defendant's residence after the abuse occurred, insinuating that they would have immediately stopped the visits if the abuse actually happened. Both victims also admitted that they had a better memory of the events at the time they disclosed the abuse than they did at the time of trial. The cross-examination challenged the credibility of the victims, as it created the insinuation that the victims were lying about being touched by the defendant. As a result, the forensic interviews were admissible to rehabilitate the credibility of the victims and to corroborate their testimony that the abuse did in fact take place. Further, the trial court provided a limiting instruction to the jury that any prior consistent statements could only be used to assess the credibility of the witness and were not to be considered as substantive evidence. We conclude that the trial court did not abuse its discretion in admitting the videos as prior consistent statements. Because the videos were properly admitted as extrinsic evidence of prior consistent statements, we need not address the defendant's constitutional challenges to the statute or his claims that the forensic interviewers did not possess the statutory criteria for admissibility. *See Barry D. McCoy*, 2012 WL 1941775, at *4.

## II. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions for aggravated sexual battery. Specifically, he claims that there was no evidence that he kissed

A.R.'s breast for his own sexual arousal or gratification and that the State failed to introduce evidence that either A.R. or A.C.R. actually touched the defendant's private part. He also contends that the appropriate standard of review for the sufficiency of the evidence permits this court to affirm the conviction only when we determine "that the evidence, if believed by the jury, would convince the average mind of the [defendant's] guilt beyond a reasonable doubt."

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after reviewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (*superseded by rule*). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Tennessee Code Annotated section 39-13-504(a)(4) defines aggravated sexual battery as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when the victim is less than thirteen years of age. The code further provides that:

> "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification."

T.C.A. § 39-13-501(6). "Intimate parts" includes "the primary genital area, groin, inner thigh, buttock, or breast of a human being[.]" *Id.* § 39-13-501(2).

The defendant contends that the State failed to prove that his alleged kissing of A.R.'s breast was done for the purposes of sexual gratification. This court has stated that in cases

8

where the sufficiency of the evidence of the defendant's intent in challenged, "intent is almost always proven circumstantially." *State v. Hayes*, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995). Viewed in the light most favorable to the State, the proof at trial showed that A.R. and A.C.R. frequently spent time at the defendant's residence. One afternoon, A.R. had been playing "dress-up" with her sister, and she was wearing a tank top that belonged to her grandmother. She went outside onto the back patio, and the defendant pulled down her tank top and kissed her breast twice. A.R. was alone with the defendant when the incident occurred. The defendant asked A.R. if she liked the kissing. When A.R. said, "No," the defendant told her, "Shh," which A.R. took to mean that she should not tell anyone about the incident. Given that the defendant waited until he was alone with A.R., asked her if she liked it when he kissed her breast, and told her not to tell anyone about the incident, a rational trier of fact could have found that the touching was intentional and could reasonably be construed as having been done for the purpose of sexual arousal or gratification.

The defendant also contends that the evidence is insufficient to show that A.C.R. actually touched an intimate part of the defendant. The victim testified that the defendant unbuckled his pants, grabbed her hand, and placed it inside of his pants. She testified that her hand went underneath the defendant's underwear and touched his skin. The jury also heard the testimony of the defendant that he only placed A.C.R.'s hand on his belt buckle. The jury, through its verdict, credited the testimony of A.C.R. over the testimony of the defendant. It is the jury who assesses the credibility of the witnesses and resolves factual questions raised by the evidence. *Bland*, 958 S.W.2d at 659. We conclude that the evidence was sufficient for a rational trier of fact to find that the defendant intentionally pulled A.C.R.'s hand toward his groin area and that she touched either the defendant's primary genital area, groin, or inner thigh. The defendant is not entitled to relief as to this issue.

### III. Prior Bad Act

The defendant argues that the trial court abused its discretion in admitting L.'s testimony that the defendant had sexual intercourse with her for two years beginning when she was fourteen years old. The alleged offenses occurred some thirty years prior to the defendant's trial. Specifically, he contends that the probative value of the evidence was outweighed by the prejudicial effect.

Tennessee Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, such evidence may be admissible for other purposes, such as illustrating motive, intent, guilty knowledge, the identity of the defendant, absence of mistake or accident, and common scheme or plan. *Collard v. State*, 526 S.W.2d 112, 114 (Tenn. 1975); Tenn. R. Evid. 404(b) Advisory Comm'n Cmt. In order to admit

9

evidence of a prior bad act:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). Our standard of review of the trial court's determinations under Tennessee Rule of Evidence 404(b) is whether the trial court's ruling was an abuse of discretion. *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). However, this decision is entitled to deference only if the trial court substantially complied with the procedural requirements of Rule 404(b). *Id.*

Here, the trial court conducted a hearing to determine whether L.'s testimony was admissible. After hearing the testimony of L., the court determined that the testimony was relevant to the defendant's intent, motive, or lack of accident or mistake, as the defendant told police that he may have inadvertently touched the victims and that he attempted to teach A.C.R. a lesson by grabbing her hand and placing it on his belt buckle. The court also determined the testimony was relevant to rebut the defendant's claim of innocence. The court found that the testimony of L. and the defendant's own admission that he was accused of abusing an ex-girlfriend's daughter provided clear and convincing evidence that the defendant committed the prior bad act. By allowing the testimony, the court implicitly found that the probative value was not outweighed by the danger of unfair prejudice. We conclude that the trial court substantially complied with the requirements of Rule 404(b), and we review the decision under the abuse of discretion standard. *See Dubose*, 953 S.W.2d at 652.

Our supreme court has explicitly rejected a general "sex crimes" exception to Rule 404(b) that would permit the admissibility of uncharged prior sex crimes. *State v. Rickman*, 876 S.W.2d 824, 829 (Tenn. 1994). The court reasoned that:

> The general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the

offense on trial.

*Id.* at 828.

The danger of a jury convicting a defendant based upon his propensity to commit a crime, rather than the evidence at trial, is especially heightened in the prosecution of a sex crime where the victim is a child because "'[t]here is no subject which elicits a more passionate response than the sexual exploitation of children. Society abhors, and rightfully so, the victimization of the defenseless child.'" *State v. Rodriguez*, 254 S.W.3d 361, 376 (Tenn. 2008) (quoting *United States v. Villard*, 700 F.Supp. 803, 809 (D.N.J. 1988)). Therefore, evidence of a prior, uncharged sex crime is generally admissible only when an indictment charges that a number of offenses occurred during a specified period of time but does not allege specific dates on which the offenses occurred. *Rickman*, 876 S.W.2d at 828.

Although the testimony was somewhat probative of the defendant's intent and to rebut a claim of accident or mistake, the probative value was decreased by the distance in time from the prior bad acts, the dissimilarity in the ages of the victims of the two episodes, and the difference in the actual crime committed. Further, the evidence was extremely prejudicial. "Our supreme court has long recognized 'the inherently inflammatory nature' of evidence of other sexual offenses and recognized that 'the danger of prejudice may require the sacrifice of relevant evidence in order to assure fairness to the criminal defendant.'" *State v. Montgomery*, 350 S.W.3d 573, 584-85 (Tenn. Crim. App. 2011) (quoting *State v. Burchfield*, 664 S.W.2d 284, 287 (Tenn. 1984)). The underlying rationale behind Rule 404(b)'s exclusion of evidence of prior bad acts is the inherent risk that the jury will convict the defendant of a crime based upon his bad character or propensity to commit a crime rather than the strength of the evidence. *Rickman*, 876 S.W.2d at 828. This risk increases when the prior bad conduct is the same or similar to the offense alleged at trial. *Id.* The defendant was on trial for aggravated sexual battery, and the jury heard testimony about an uncharged, thirty-year-old rape that occurred outside the time period alleged in the indictment. Accordingly, we conclude that the probative value of the evidence was not outweighed by the danger of unfair prejudice and that the trial court erred in admitting the testimony of L. We must next determine whether this error was harmless.

Our supreme court has recognized three categories of error: structural constitutional error, non-structural constitutional error, and non-structural error. *Rodriguez*, 254 S.W.3d at 371; *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003). Rulings regarding the admissibility of evidence are analyzed as non-structural error, as "an evidentiary ruling ordinarily does not rise to the level of a constitutional violation." *Powers*, 101 S.W.3d at 397. Tennessee Rule of Appellate Procedure 36(b) controls the analysis of a non-structural error, and it places the burden on the defendant to demonstrate that the error "'more probably

11

than not affected the judgment or would result in prejudice to the judicial process.'" *Rodriguez*, 254 S.W.3d at 371-72 (quoting Tenn. R. App. P. 36(b)). This court must consider the record in its entirety, including "the properly admitted evidence of the defendant's guilt." *Id.* at 372 (citing *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000). When the amount of guilt is substantial, the defendant bears a heavier burden "to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." *Id.* (citations omitted).

The purpose of a harmless error analysis is for this court "to ascertain the actual basis for the jury's verdict," and the "crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *Id.* An error is not harmless "[w]here [the] error more probably than not had a substantial and injurious impact on the jury's decision-making." *Id.* Cases that present close questions of witness credibility make it less likely that an error will be harmless because "[t]he harmful effects of propensity evidence that undermines a defendant's credibility increase in close cases when the outcome is dependent on the jury's assessment of the witnesses' credibility." *Id.* at 377.

Tennessee courts have repeatedly held that admission of uncharged sexual activity of the defendant creates an unfair prejudice that warrants the reversal of a conviction. *See id.* at 377-78 (concluding that in a case where the testimony of the victims was the only evidence of the defendant's abuse, admission of evidence that the defendant viewed or possessed child pornography to show his propensity to abuse children was prejudicially unfair to the defendant "and, more probably than not, . . . affected the verdict of guilt."); *Montgomery*, 350 S.W.3d at 582, 587 (concluding that admission of the victim's testimony about uncharged sexual acts with the defendant outside of those alleged in the indictment prejudiced the defendant sufficiently enough to warrant a new trial); *State v. Woodcock*, 922 S.W.2d 904, 912 (Tenn. Crim. App. 1995) (concluding that when "the State referred to the evidence of uncharged misconduct so ostentatiously and so frequently that it overwhelmed the victim's succinct and matter-of-fact testimony" regarding the charged instances of sexual abuse, "the admission of evidence of uncharged sexual misconduct unrelated to any of the counts in the indictment was highly prejudicial and more probably than not did affect the judgment in this case."); *State v. Jeff Carter*, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212, at *15 (Tenn. Crim. App. Dec. 16, 2010) (concluding that when no physical evidence or witnesses other than the victim corroborated the allegations of abuse, doctors found no physical indications of sexual abuse, the victim recanted her allegations four days after making them, and the allegations did not reemerge until nine years later, admission of evidence of the defendant's prior bad acts and unindicted charges was not harmless error). In this case, the primary evidence of the defendant's abuse was the testimony of the victims. We conclude that the introduction of the defendant's uncharged rapes more probably than not affected the jury's assessment of the evidence to the defendant's prejudice. The fact that the defendant

was never charged or punished for his crimes against L. adds to the prejudicial value of the evidence and "more probably than not, made it easier for the jury to disbelieve" the defendant and "freed the jury to conclude more comfortably" that the defendant committed aggravated sexual battery against the victims. *Rodriguez*, 254 S.W.3d at 377. Additionally, as we will explain below, the prosecutor's closing argument further compounded the harm of admitting the evidence. Accordingly, we conclude that the admission of the evidence of the uncharged rape was not harmless, as it more likely than not affected the verdict of the trial. We therefore must reverse the defendant's convictions for aggravated sexual battery and remand the case for a new trial.

### IV. Election of Offenses

The defendant argues that the trial court committed plain error when it failed to require the State to make an election of offenses and failed to instruct the jury on the issue of election. Specifically, he claims that the State was required to make an election of offenses in regards to A.R. because she testified about three incidents of sexual misconduct, and a failure to make an election prevented the jury from reaching a unanimous verdict. The State responds that no election was necessary because the evidence did not show evidence of multiple offenses against A.R. and that if an election was required, the State made an effective election in its closing argument.

The doctrine of election requires the State to elect a set of facts when it charges a defendant with one offense, but there is evidence of multiple offenses. *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999). This doctrine is applied to ensure that the defendant can prepare for the specific charge, to protect the defendant from double jeopardy, and to allow an appellate court to review the legal sufficiency of the evidence. *Id.* Most importantly, election ensures that some jurors do not convict the defendant of one offense and other jurors of another. *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). It is the duty of the trial court to require the State to make an election of offenses at the close of its case-in-chief regardless of whether the defendant requested the instruction. *State v. Kendrick*, 38 S.W.3d 566, 569 (Tenn. 2001); *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Thus, we may review the issue for plain error even though the defendant did not request that the State make an election of offenses or raise the issue in his motion for new trial. *See State v. Hodge*, 989 S.W.2d 717, 720 (Tenn. Crim. App. 1998).

When the victim of a crime is a young child who may not be able to recall the specific date when the abuse occurred, evidence of other sex crimes committed by the defendant may be admissible when the crimes occurred during the time period indicated by the indictment. *Rickman*, 876 S.W.2d at 828; *see State v. McCary*, 119 S.W.3d 226, 244 (Tenn. Crim. App. 2003). However, at the close of its proof, the State must then elect the particular incident for

13

which it is seeking a conviction. *Rickman*, 876 S.W.2d at 829; *McCary*, 119 S.W.3d at 244. The State may effectively make this election through closing argument. *See State v. Warren Curnutt*, No. M2006-00552-CCA-R3-CD, 2007 WL 1482390, at *6 (Tenn. Crim. App. May 22, 2007), *perm. app. denied* (Tenn. Sept. 17, 2007); *see also State v. William Darryn Busby*, No. M2004-00925-CCA-R3-CD, 2005 WL 711904, at *6 (Tenn. Crim. App. Mar. 29, 2005) (citing *State v. James Arthur Kimbrell*, No. M2000-02925-CCA-R3-CD, 2003 WL1877094, at *23 (Tenn. Crim. App. Apr. 15, 2003); *State v. Michael J. McCann*, No. M2000-2990-CCA-R3-CD, 2001 WL 1246383, at *5 (Tenn. Crim. App. Oct. 17, 2001); *State v. William Dearry*, No. 03C01-9612-CC-00462, 1998 WL 47946, at *13 (Tenn. Crim. App. Feb. 6, 1998)).

Here, A.R. testified as to three separate incidents involving the defendant, although only one of the incidents constituted proof of a completed aggravated sexual battery because only one incident resulted in the intentional touching of the defendant's or of the victim's intimate parts. In the first incident, the defendant pulled down A.R.'s shirt and kissed her breasts. In the second incident, the defendant grabbed A.R.'s hand and pulled it toward his groin area, but A.R. never came into contact with the area. In the third incident, the defendant exposed himself to A.R., but no physical touching of an intimate area occurred. Because the evidence only established only one instance in which the jury could have found the defendant guilty of aggravated sexual battery, the risk of the jury returning a "patchwork verdict" was eliminated, and we conclude that the defendant received a unanimous verdict.

Even if the State were required to make an election of offenses, we conclude that the State made an appropriate election during its closing argument. During closing arguments, the State referred only to the defendant's kissing of A.R.'s breast as the incident of unlawful sexual contact. Although the State mentioned that "Papaw's not supposed to be creeping around his own house every time you turn a corner, pulling down his pants and saying, 'What do you think of that?[,]'" which is arguably a reference to the third incident that A.R. described, the State repeatedly emphasized that the defendant committed unlawful sexual contact against A.R. when he kissed her breast. Therefore, the State sufficiently indicated to the jury which incident the State elected as aggravated sexual battery. The defendant is not entitled to relief as to this issue.

### V. Closing Argument

The defendant raises the issue of prosecutorial misconduct and asks this court to address the issue under plain error review. As the State correctly points out, the defendant did not make any contemporaneous objections during the State's closing arguments, and he did not raise this issue in his motion for new trial. Normally, the failure to lodge a contemporaneous objection at trial results in a waiver on appeal of the issue of prosecutorial

14

misconduct. *See* Tenn. R. App. P. 36(a); *see also State v. Thornton*, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999). However, an error which has affected the substantial right of a defendant may be noticed at any time in the discretion of the appellate court where necessary to do substantial justice. *State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999). "Plain error," or "fundamental error," is recognized under Tennessee Rule of Appellate Procedure 36(b). Some errors are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

In order to determine whether an error rose to the level of "plain error," this court must consider five factors: "'(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Complete consideration of all five factors is unnecessary if at least one is absent. *Id*. at 283. Furthermore, the plain error must be such that it probably changed the outcome of the trial. *Adkisson*, 899 S.W.2d at 642.

Closing argument is a valuable tool for both parties during trial, and wide latitude is given to counsel in presenting these arguments to the jury. *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). Consequently, a trial court is accorded wide discretion in its control of closing arguments. *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). This court will not interfere with that discretion unless there is evidence it was abused. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). However, closing arguments "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *Goltz*, 111 S.W.3d at 5. In order to determine if closing remarks were improper, this court generally recognizes five areas of prosecutorial misconduct:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence of guilt of the defendant.

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

15

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Id.* at 6 (citations omitted).

This court should not lightly overturn a criminal conviction based solely upon a prosecutor's closing arguments. *See State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). Closing arguments should provide a basis for reversal only when "it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Id.* In order to measure the prejudicial impact of any misconduct, this court should consider: (1) the conduct in light of the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). To show error, a defendant must demonstrate that the argument was so inflammatory or the conduct so improper that it affected the verdict to the defendant's detriment. *Id.*

The defendant first takes issue with the prosecutor's statement that the defendant testified, "I guess I had sexual contact with her," and the statement that the defendant "admitted to unlawful sexual contact." He argues that the prejudicial effect was compounded by the trial court's instruction to the jury that "[e]vidence has been introduced in this trial of a statement or statements by the Defendant made outside the trial, to show a confession or an admission against interest." In the defendant's statement to Lieutenant Ray, he said that he touched A.C.R.'s hand to his belt buckle and admitted that he may have inadvertently touched both victims while picking them up. While the prosecutor's paraphrase of the defendant's admission was not exact, the defendant's statement that he may have "touched" the victims while picking them up could fairly be construed as an admission of having sexual contact with the victims. Further, the trial court admonished the jury that the statements of counsel during closing arguments were not to be considered as evidence and that the jury should disregard any statement that they believed was not supported by the evidence. It is presumed that the jury follows the instructions of the trial court. *See State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). We conclude that the prosecutor's statement, even if it was in error, did not prejudice the defendant to the degree that it affected the outcome of the trial.

Accordingly, the defendant cannot demonstrate that a substantial right was adversely affected or that consideration of the issue is necessary to do substantial justice, and he is not entitled to relief.

The defendant next contends that the prosecutor expressed her personal opinion as to the guilt of the defendant and attempted to inflame the passions of the jury with the following statements:

> Because [the defendant] was testing the waters. That is what I submit to you. [The defendant] was going to see if [the victim] was going to say anything. That is what I think happened that day. [The defendant] was seeing if [A.C.R.] was the one that would tell somebody, if she was going to accept it, if he was going to be able to escalate it to the next step. That is what I submit to you we are seeing with [A.R.] and [A.C.R.]. [The defendant] was preparing them. He was setting it up. And [A.C.R.] and [A.R.] talked on the upswing.
>
> . . . .
>
> Ladies and gentlem[e]n, a perpetrator who comes in and says, "This six-year-old was bragging," should be a red flag to everyone, period, end of story.

A prosecutor should not inject his or her personal opinions or beliefs into closing arguments, but the determination of whether doing so constitutes misconduct is often a question of the specific terminology of the prosecutor. *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007). A prosecutor's use of the phrases "I think," or "I submit" does not always indicate a prosecutor's personal opinion. *Id.* After reviewing the prosecutor's argument, it is our conclusion that the prosecutor was not attempting to convey her personal beliefs to the jury but instead to illustrate the theory of the State's case and to address the defendant's intent and motive.

There also was no impropriety in the prosecutor's referring to the defendant as a "perpetrator." The defendant was on trial because the State believed that he perpetrated the abuse of the victims; the prosecutor used the word "perpetrator" in the same context that one would use the word "defendant." The statement did not constitute the improper use of an epithet to characterize the defendant or derogatory name-calling. *See State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998) (stating that the use of the term "the evil one" to describe the defendant was improper); *State v. Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *129 (Tenn. Crim. App. Oct. 11, 2002) (calling the defendant "a human predator" was derogatory and improper but did not affect the verdict), *perm. app.*

17

*denied* (Tenn. Feb. 18, 2003). The defendant cannot demonstrate that a clear and unequivocal rule of law was breached and is not entitled to relief.

The defendant's next claim of misconduct is that the prosecutor alluded to the consequence of the jury's verdict in rebuttal closing argument by asking the jury if they would "just turn [the defendant] loose" if they credited his testimony. The prosecutor told the jury:

> You're here because of something you said, a response that you had, information that you gave that led us to believe that you were the best possible group we could get to hear this case. And [the defendant has] had a fair trial. Witnesses were called, he has a great attorney, those witnesses were questioned, he was allowed to put on proof, he chose to take the stand and told you his side.
>
> What do you think about [the defendant's] side? What do you think about the story, the explanation he gave for what happened? Do you believe it? Did you believe him? Because if you did, you know what you're supposed to do, right? Will you just turn him loose?"

The argument begins with a reference to the jury's duty to acquit the defendant if the members chose to credit his testimony. The prosecutor's last question, however, urges the members of the jury to consider that they would be releasing a sex offender back into society if they returned a verdict of not guilty. It is improper for a prosecutor to make a prediction as to the consequence of a jury's verdict. *See Goltz*, 111 S.W.3d at 6. However, this was an isolated statement made in the context of properly urging the jury to exercise its role as the arbiter of credibility, and we conclude that the prosecutor's remark was not so inflammatory as to affect the verdict to the defendant's detriment.

The defendant's final issue concerns a second portion of the prosecutor's rebuttal closing argument. In the relevant portion of the rebuttal closing argument, the prosecutor stated:

> These little girls, with your verdict, you can never erase for them that summer, that year that [the defendant] decided that he would gratify himself at their expense. You -- you can't take that away. They had a six- and an eight-year-old's understanding of it then. Now, a couple of years later, they have a different understanding. And when they're grown, they'll have a different understanding. They'll get it fully. But you can't erase that. But what you can do with your verdict is send all involved away, knowing that

18

justice has prevailed.

> [L.] didn't get it for whatever reason in '79 and '80, whether it was because of her disability,[3] whether it was because she didn't have a protective mother, whether it was because they took her away and put her in a group home, she didn't get it. She's not lying. She told the truth then, and she told you what happened. Use that if you need to to determine what his intention,[4] what his plan, what his motive, what his purpose was years later when, once again, he put himself in a situation where he was with a woman, with the younger children, built a relationship, trusted to be alone with that child, and he abused the trust on every single level. So you can't fix it, you can't erase it, you can't -- can't take away that experience, but with your verdict, you can tell him that you won't tolerate it. Not now, not in 2013.

The prosecutor's closing argument was, in essence, urging the jury to punish the defendant for a crime for which he was not on trial. Such an argument is improper even if based upon admissible evidence, but the argument further compounded the error of admitting L.'s testimony. Moreover, the prosecutor's comments that L. was "not lying" and that she "told the truth [at the time of the allegations]" constituted improper vouching for the truthfulness of a witness.

Although the prosecutor stated that the jury should use L.'s testimony to determine the defendant's intent, plan, motive, and purpose, the argument was premised on testimony that should not have been presented to the jury. Because the defendant did not contemporaneously object, no curative measures were taken by the trial court. It appears that the intent of the prosecutor was to inflame the passions and prejudices of the jury, as the argument implied that a guilty verdict could also provide L. with justice that she never received. The cumulative effect of the remarks and the erroneous admission of L.'s testimony were serious. The prosecutor was able to base argument off of inadmissible and highly prejudicial evidence, which may have caused the jury to decide the case on grounds other than admissible evidence of the defendant's guilt. We must next determine whether this argument rises to the level of plain error.

---

[3] At trial, L. testified that she received Social Security Income because she had a learning disability that affected her ability to "count change."

[4] We note that separate prosecutors delivered the closing and rebuttal closing arguments. In the State's closing argument, the first prosecutor informed the jury that L.'s testimony was to be used by the jury "solely to make a determination of whether or not [the defendant] intentionally, knowingly, or recklessly acted with [the victims]."

19

Examining the *Adkisson* factors, we conclude that the prosecutor's argument does constitute plain error. The defendant included a transcript of the trial proceedings and closing arguments in the record on appeal, clearly establishing what occurred in the trial court. The prosecutor's argument was improper, breaching a clear and unequivocal rule of law. The argument, along with the admission of L.'s testimony, adversely affected the defendant's right to a fair trial. Although the defendant did not make a contemporaneous objection, he did object at the 404(b) hearing to L.'s testimony. Because the defendant had already sought, and failed, to obtain a ruling excluding references to the crimes against L., it appears that the defendant did not waive this issue for tactical reasons. Finally, consideration of the issue is necessary to do substantial justice. Because L.'s testimony was erroneously admitted and directly led to the prosecutor's improper argument, we conclude that the cumulative effect of these errors more likely than not affected the verdict and necessitates reversal of the defendant's convictions. Accordingly, the case must be remanded for a new trial on both counts.

## VI. Sentencing

The defendant argues that the trial court imposed an excessive sentence and erred in imposing consecutive sentences. The defendant contends that the trial court misapplied enhancement factor (1) because he did not receive an adequate opportunity to investigate L.'s claims of sexual abuse, and the State did not provide any records to support L.'s allegations of sexual abuse; the court misapplied enhancement factor (14) because it was not established that the defendant was in a position of private trust; and the court failed to apply the mitigating factor that his conduct did not cause or threaten serious bodily injury. The defendant also claims that the trial court erred in imposing consecutive sentences because the sentences were not the least severe measure necessary to achieve the purposes of sentencing.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. The misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing as provided by statute." *Id.*

After the trial court establishes the appropriate range of the sentence, the court must

20

consider the following factors to determine the specific length of the sentence: (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in his own behalf about sentencing. T.C.A. § 40-35-210(a), (b)(1)-(7).

The trial court found that the defendant was a standard, Range I offender. The court applied enhancement factor one, finding that L.'s testimony proved by a preponderance of the evidence that the defendant had a history of prior criminal behavior. The trial court also found that enhancement factor fourteen applied because the defendant abused a position of private trust to commit the offenses. The court did not find that any mitigating factors applied, but the court noted that the defendant had never been arrested before, had a consistent work history, and served his country honorably in the Marine Corps. The court considered the victim impact statements of A.R. and A.C.R., where both victims stated that the incidents affected their performance in school and made them feel afraid. The court also found that the defendant refused to accept responsibility for his actions but instead continued to claim that all of the witnesses against him were untruthful. After considering the appropriate statutory factors, the court sentenced the defendant to the maximum sentence of twelve years for each conviction.

The record supports the findings of the trial court. The trial court found by a preponderance of the evidence that the defendant sexually abused L., and it appropriately applied the enhancement factor. The record also shows that the defendant was the victims' step-grandfather, the victims frequently spent time at the defendant's residence, and the defendant was entrusted to care for the victims. The trial court appropriately applied enhancement factor (14). Even if the trial court erred in declining to find any mitigating factors, "the misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Here, the sentence was within range and comported with the principles of the Sentencing Act. The defendant is not entitled to any relief.

The defendant also takes issue with the imposition of consecutive sentences, contending that the trial court erroneously classified him as a dangerous offender and that consecutive sentences were not the least severe measures necessary to achieve the purposes of sentencing. The State concedes that the trial court erred in classifying the defendant as a dangerous offender but argues that other statutory factors were met that justified consecutive sentencing.

21

A trial court has the ability to impose consecutive sentences if it finds by a preponderance of the evidence that the defendant falls into one of seven categories, including that "[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims." T.C.A. § 40-35-115(b)(5). The court may also impose consecutive sentences if it finds that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime where the risk to human life is high." *Id.* § 40-35-115(b)(4). When a trial court orders consecutive sentencing, the overall sentence "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purpose for which the sentence is imposed." *Id.* § 40-35-103(2), (4). A trial court's decision to impose consecutive sentencing is also reviewed under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). So long as the "trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable, and absent an abuse of discretion, upheld on appeal." *Id.* at 862.

The court found that the defendant was convicted of two or more statutory offenses involving the sexual abuse of a minor and that the defendant was a dangerous offender whose behavior indicated little or no regard for human life and who had no hesitation about committing a crime in which the risk to human life was high. The court found that the length of the sentence was reasonably related to the severity of the defendant's offenses and that confinement was necessary to protect the public from further criminal acts by the defendant. In finding that the defendant was a dangerous offender, the court noted that the defendant committed offenses against both victims when no one was present. The court observed that, even though no penetration occurred, the defendant still committed a dangerous crime and was a dangerous offender. The court stated that the defendant engaged in "deviant sexual behavior, touching two young women -- two young girls and penetrating, raping another child many, many times over a two-year period of time." The court found that the defendant committed separate and distinct crimes against A.R. and A.C.R. and that he should be held equally responsible for each offense. The court observed that the defendant "probably never needs to be released from prison" because, if released, he would "continue to prey upon vulnerable children that cannot protect themselves." The court noted that the defendant would be "very old" by the time he was released if the sentences were served consecutively but found that consecutive sentences were appropriate to ensure that the defendant's separate and distinct violations of the law were equally punished.

The trial court also considered the victim impact statements of A.R. and A.C.R. A.C.R.'s victim impact statement indicated that, although she did not suffer any physical injuries, "sometimes [her] heart hurt[]" and the defendant's conduct made her sad. She was afraid to sleep alone when she was with him and was unable to concentrate in school. She stated that she did not want the defendant to be able to hurt any other children and that she felt safer when he was in jail. A.R. told the court that the defendant's actions caused her to have nightmares for three years. A.R. blamed herself for the abuse, believing that it was her fault. A.R. struggled in school as well after the abuse, but she said that she was able to regain her concentration at school and sleep better after the defendant was incarcerated. Both victims asked the court to impose the maximum sentence possible so that the defendant could not harm any more children.

We conclude that the trial court properly imposed consecutive sentences. Even if the trial court improperly classified the defendant as a dangerous offender, the court engaged in the required considerations of Tennessee Code Annotated section 40-35-115(b)(5) and found that the defendant committed two statutory offenses involving the sexual abuse of a minor. The trial court found that the defendant committed the offenses when he was alone with the victims and that he used his role as a step-grandparent to perpetrate the abuse. The record reflects that the abuse went undetected until September of 2010. Both victims testified that the defendant told them not to tell anyone about the abuse, and both victims believed that they would get in trouble if they spoke of the abuse. The court considered the nature and scope of the abuse, noting that, although the defendant never penetrated the victims, his conduct still constituted "deviant sexual behavior." The court further considered the victim impact statements of A.R. and A.C.R., observing that A.R. had nightmares for three years and that both victims struggled to concentrate in school after the abuse. The record supports the trial court's imposition of consecutive sentences.

We also conclude that consecutive sentences were the least severe measure necessary to achieve the purpose of sentencing. The defendant contends that his lack of prior convictions, steady employment history, honorable military service, and age makes a twenty-four year sentence greater than deserved for his offenses. The trial court, as it had the discretion to do, afforded little weight to these mitigating factors. The court also explicitly rejected the defendant's age as a factor weighing against consecutive sentencing, stating that "it is not an argument that this court will ever accept that a person is of age, he is a little bit old and it is not in anybody's best interest to make him serve a sentence that might cause [him] never to be released from prison." The trial court found that, based upon the defendant's conduct toward the victims and L., he would likely continue to "prey upon vulnerable children" if he was released from confinement. The court also found that the defendant committed offenses against both victims and that consecutive sentencing was appropriate to ensure that the defendant was punished for both offenses. "The power of a

23

trial judge to impose consecutive sentences ensures that defendants committing separate and distinct violations of the law receive separate and distinct punishments" and prevents a defendant from otherwise escaping "the full impact of punishment for one of their offenses." *State v. Robinson*, 930 S.W.2d 78, 85 (Tenn. Crim. App. 1995). Accordingly, the trial court appropriately sentenced the defendant, and he is not entitled to relief as to this issue.

## VII. Cumulative Error

The defendant argues that the cumulative effect of the trial court's errors deprived him of his right to due process. However, as we concluded above, the admission of L.'s testimony and the prosecutor's improper closing argument require reversal of the defendant's convictions.

## CONCLUSION

For the foregoing reasons, we conclude that the trial court erred in admitting evidence of the defendant's uncharged sex crimes and that the effect of this error rendered the State's closing argument improper. Accordingly, we reverse the defendant's convictions for aggravated sexual battery and remand the case for a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE